1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2

3

DEBRA P. HACKETT,
U.S. DISTRICT COURT
MIDDLE DISTRICT

4

5

LINDSEY BLAHOUS, on behalf of herself,
as guardian of her minor children L.B., F.B.,
and D.I. and on behalf of all others similarly
situated,

CASE NO.: 2:19-CV-798 ECM

6

CLASS ACTION

7

COMPLAINT FOR DAMAGES,
EQUITABLE, DECLARATORY AND
INJUNCTIVE RELIEF

Plaintiff,

8

9

v.

DEMAND FOR JURY TRIAL

SARRELL REGIONAL DENTAL
CENTER FOR PUBLIC HEALTH,
INC.

10

11

12

Defendant.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

CLASS ACTION COMPLAINT

1  Plaintiff Lindsey Blahous ("Plaintiff"), individually, on behalf of her minor children and on
2  behalf of all others similarly situated, by and through her undersigned counsel, brings this class
3  action lawsuit against Sarrell Regional Dental Center for Public Health, Inc. ("Defendant" or
4  "Sarrell"), and alleges based upon information and belief and the investigation of her counsel as
5  follows:

**INTRODUCTION**

7  1.  Sarrell is a specialized provider of dental and optical services for children in
8  Alabama. It is the largest provider of dental services in Alabama operating 17 clinics across the
9  state.

10  2.  On September 12, 2019, Sarrell announced that on July 12, 2019, it discovered
11  ransomware on its network that was the result of a cyber intrusion which occurred in January 2019. The
12  hackers responsible for the intrusion obtained access to sensitive personal health information and
13  personally identifiable information of Sarrell patients and their guardians (collectively, "PII").[1] The
14  exposed PII included: names, mailing addresses, Social Security numbers, dates of birth, health
15  insurance numbers, and treatment information including; dates of service, diagnosis codes,
16  procedure codes and treating provider ("Data Breach"). The Data Breach affected approximately
17  391,472 patients and patient guardians (collectively, "Patients").

18  3.  Although the Data Breach occurred in January 2019, Sarrell did not discover it until
19  July 12, 2019, and then waited another two full months before notifying affected Patients.

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number). Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, ("HIPAA"), protected health information ("PHI") is considered to be individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

CLASS ACTION COMPLAINT

1    4.    The Data Breach was a direct result of Defendant's failure to implement adequate and

2    reasonable cyber-security procedures and protocols necessary to protect Patient PII.

3    5.    Defendant disregarded the rights of Plaintiff and Class Members (defined below) by,

4    *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and

5    reasonable measures to ensure its data systems were protected against unauthorized intrusions;

6    failing to disclose that it did not have adequately robust computer systems and security practices to

7    safeguard Patient PII; failing to take standard and reasonably available steps to prevent the Data

8    Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiff and

9    Class Members prompt and accurate notice of the Data Breach.

10   6.    As a result of Defendant's failure to implement and follow basic security procedures,

11   Patient PII is now likely in the hands of thieves. As a result, Plaintiff and Class Members have had to

12   spend, and will continue to spend, significant amounts of time and money in an effort to protect

13   themselves from the adverse ramifications of the Data Breach and will forever be at a heightened

14   risk of identity theft and fraud.

15   7.    Plaintiff, on her own behalf, on behalf of her minor children, and on behalf of all

16   others similarly situated, alleges claims for negligence, negligence *per se* and breach of implied

17   contract, and seeks to compel Defendant to adopt reasonably sufficient security practices to

18   safeguard Patient PII that remains in its custody in order to prevent incidents like the Data Breach

19   from reoccurring in the future.

20   **PARTIES**

21   8.    Plaintiff Lindsey Blahous is a resident of Anniston, Alabama. She brings this action

22   on behalf of herself and as the guardian of her three minor children, L.B., F.B., and D.I., each of

23   whom is a patient of Defendant Sarrell and was affected by the Data Breach. On or about September

24   12, 2019, Ms. Blahous received notices of the Data Breach ("Notice") from Sarrell explaining that

25   her PII and the PII of her children had been exposed for nearly 9 months. Copies of the Notices

26   received by Ms. Blahous and her children are attached hereto as Exhibits A-D.

27

28

9.     Since receiving the Notice, Ms. Blahous has contacted all three major credit bureaus in order to put credit freezes on her children's credit. This could not be done online and further required obtaining copies of her children's birth certificates to send to the credit bureaus along with a letter confirming her identity.

10.     Since the announcement of the Data Breach, Ms. Blahous continues to monitor her accounts and the pristine credit of her minor children. In addition to efforts taken to protect her financial integrity and that of her children, Ms. Blahous remains concerned that the exposed PII, which included the birthdays and home addresses of her children, poses significant security and safety concerns.

11.     Ms. Blahous has and continues to spend her valuable time to protect the integrity of her children's physical and fiscal well-being—time that she would not have had to expend but for the Data Breach.

12.     Plaintiff and her children suffered actual injury from having their PII exposed as a result of the Data Breach, including, but not limited to: (a) paying monies to Sarrell for its goods and services which they would not have paid had Sarrell disclosed that it lacked sufficient data security measures to safeguard Patients' PII from theft; (b) damages to and diminution in the value of their PII—a form of intangible property that Plaintiff entrusted to Sarrell as a condition for health-related services; and (c) imminent and impending injury arising from the increased risk of fraud and identity theft.

13.     As a result of the Data Breach, Ms. Blahous and her children will continue to be at a heightened risk for financial fraud, medical fraud and identity theft, and their attendant damages for years to come.

14.     Defendant Sarrell Regional Dental Center for Public Health, Inc. is an Alabama non-profit corporation located at 641 South Lawrence Street, Montgomery, AL 36104. Founded in 2004, Sarrell provides dental and optical services to children across Alabama.   It is the state's largest provider of dental services with 17 clinics across Alabama.   It has 250 employees and has serviced more than 845,000 children.

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are approximately 391,472 putative Class Members, and at least some Members of the proposed Class have a different citizenship from Sarrell.

16.     This Court has jurisdiction over Defendant, as it is headquartered in this District, and the network systems implicated in this Data Breach are likely based in this District.

17.     Plaintiff's children engaged in underlying health services within this District where their PII was maintained and where the Data Breach occurred, which led to them sustaining damage. Through its business operations in this District, Sarrell intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District. Sarrell is based in this District, maintains patient PII in the District, and has caused harm to Plaintiff and Class Members residing in this District.

**STATEMENT OF FACTS**

*A. The Sarrell Data Breach*

19.     On July 12, 2019, Sarrell discovered that the PII of 391,472 of its Patients had been compromised as a result of an intrusion by a hacker who also left ransomware on Sarrell's network. Although the intrusion occurred in January 2019, it went undiscovered for approximately 6 months.

20.     The exposed PII included: names, mailing addresses, Social Security numbers, dates of birth, health insurance numbers, and treatment information including: dates of service, diagnosis codes, procedure codes and treating providers.

21.     Despite the fact that Patient PII had been exposed for six months, Sarrell still waited an additional 2 months before notifying affected Patients that their sensitive PII had been compromised.

22.     On September 12, 2019, Sarrell publicly announced the Data Breach, stating in relevant part as follows:

**Notice of Data Breach**
At Sarrell Dental, we take the security of patient information very seriously, so it is out of an abundance of caution that we are informing you of a data breach that may have resulted in the disclosure of some of your personal health information. We sincerely apologize for any inconvenience this incident may cause. This letter contains information about steps you can take to protect your information and resources we are making available to you.

**What Happened**
In July 2019, we detected ransomware on Sarrell computers that appears to have been the result of an intrusion that may have begun January 2019. Ransomware is a type of malware usually used by hackers to encrypt a victim's files and demand payment in return for the decryption key. We immediately deactivated our network, temporarily closed our practices, engaged an independent computer security firm to investigate, and did not pay a ransom.

The investigation has not found evidence that any files or information were copied, downloaded or removed from our network as a result of the ransomware. In addition, we have not discovered any evidence that information that may be involved in this incident has been misused. However, because we cannot rule out the possibility that the hackers obtained sensitive information from the network, we are providing you with information about resources to assist you in protecting your information.

**What Information Was Involved**
The information potentially impacted may include your name, address, Social Security Number, date of birth, health insurance number, and treatment information including dates of service, diagnosis codes, procedure codes and treating provider.

**What We Are Doing**
To protect our health information in the future, we rebuilt our business systems with updated security and virus protection for the entire Sarrell network before reopening our practices. Our network and systems are monitored with upgraded capabilities to ensure that our system and the intonation we store will remain secure.

We are offering identity theft protection services through ID Experts® to provide you with MyIDCare™. MyIDCare services include 12 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services. With this protection, MyIDCare will help you resolve issues if your identity is compromised.

> To receive credit monitoring, you must be over the age of 18, have established
> credit in the U.S., have a Social Security Number in your name, and have a
> U.S. residential address associated with your credit file.

### B. Prevalence of Cyber Attacks and Particular Susceptibility of the Healthcare Sector

23.     In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a forty percent increase in the number of data breaches from the previous year.[2]  In 2017, a new record high of 1,579 breaches were reported, representing a 44.7 percent increase over 2016.[3]

24.     In 2018, the healthcare sector reported the second largest number of breaches among all measured sectors and the highest rate of exposure per breach.[4] Indeed, healthcare-related data is among the most sensitive, and personally consequential when compromised. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident…came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage.[5]  Almost 50 percent of the victims lost their health care coverage as a result of the incident, while nearly one-third said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the entire economy as a whole.[6]

25.     Healthcare related data breaches in particular have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the last 12 months,

---

[2] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at* https://www.idtheftcenter.org/surveys-studys.

[3] Identity Theft Resource Center, 2017 Annual Data Breach Year-End Review, available at https://www.idtheftcenter.org/2017-data-breaches/.

[4] Identity Theft Resource Center, 2018 End -of-Year Data Breach Report. Available at https://www.idtheftcenter.org/2018-data-breaches/.

[5] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010) https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[6] *Id.*

---

CLASS ACTION COMPLAINT

with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[7] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[8]

26.     As a healthcare provider, Sarrell knew, or should have known, the importance of safeguarding Patient PII entrusted to it and of the foreseeable consequences if its data security systems were breached, including the significant costs that would be imposed on its patients as a result of a breach; yet, it failed to take adequate cyber-security measures to prevent the Data Breach from occurring.

### C. Sarrell Acquires, Collects, and Stores Plaintiff and Class Members' PII

27.     Defendant acquires, collects, and stores a massive amount of protected health-related information and other personally identifiable data on its Patients.

28.     As a condition of engaging in health services, Sarrell requires that its Patients entrust it with highly sensitive personal information.

29.     By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members' PII, Sarrell assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff and Class Members' PII from disclosure.

30.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members, as current and former Patients, relied on Sarrell to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

---

[7] https://www.himss.org/2019-himss-cybersecurity-survey (last visited June 14, 2019).

[8] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, available at https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

### D. Defendant's Privacy Practices

31.     Sarrell maintains a series of privacy policies wherein it expresses its commitment to protecting Patient PII. "Sarrell Dental takes your privacy seriously. We want to tell you about our privacy practices to protect your personal health information."[9] Among other things, Sarrell makes the following commitments to its Patients:

   a.  We comply with all applicable state and federal laws, including any laws that impact our ability to use your health information for payment and operations.

   b.  Sarrell Dental is required by law to "[m]aintain the privacy of your health information.

   c.  In compliance with state and federal standards, electronic, procedural, and physical safeguards are in place to limit the collection and use of non-public information to the minimum necessary to provide you with quality products and services. Access to this information is limited to a "need to know" basis for our employees to perform their jobs. This applies to you whether you are a former or current member.

### E. The Value of Personally Identifiable Information and the Effects of Unauthorized Disclosure

32.     Sarrell was well aware that the PII it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

33.     Personally identifiable information is a valuable commodity to identity thieves.  As the FTC recognizes, with PII identity thieves can commit an array of crimes including identify theft, medical and financial fraud.[10] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites.

34.     While credit card information and associated PII can sell for as little as $1 to $2 on the black market, protected health information can sell for as much as $363 according to the Infosec

---

[9] http://www.sarrelldental.org/privacy-policy

[10] Federal Trade Commission, *Warning Signs of Identity Theft*, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft

Institute. This is because one's personal health history (e.g. ailments, diagnosis, surgeries, etc.) cannot be changed.[11] PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

35.   In addition to PHI, Plaintiff and Class Members' other PII is also valuable. For example, Social Security numbers are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

36.   The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

37.   Moreover, it is not easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[12]

---

[11] Center for Internet Security, Data Breaches: In the Healthcare Sector, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/
[12] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited February 13, 2019).

CLASS ACTION COMPLAINT

38.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[13]   As explained above, the inclusion of PHI, such as the information exposed here, is even more valuable.[14]

39.     At all relevant times, Sarrell knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences if its data security systems were breached, including, the significant costs that would be imposed on patients as a result of a breach.

### F.  *Minors whose PII is exposed are particularly susceptible to identity theft and fraud*

40.     While minors face the same risks as adults when their information is compromised in a data breach, their information is far more valuable.  More than 1 million children (1.48% percent of minors) were victims of identity theft or fraud in 2017, two-thirds of whom were age 7 or younger.[15]

41.     Cyber criminals are more likely to capitalize on children's PII because the "blank slate" a child provides can enable a criminal to do more damage by opening new lines of credit before someone catches on. Moreover, because "child identity theft schemes can go undetected for years, often until they're old enough to open up a credit card account, their data is considered especially valuable."[16]  Indeed, "among notified breach victims [in 2017], 39% of minors became victims of fraud, versus 19% of adults."[17]

---

[13] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, *available at* http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited February 13, 2019).

[14] *Supra* at n. 12.

[15] Grant, K, Identity theft isn't just an adult problem. Kids are victims, too, CNBC, April 24, 2018, https://www.cnbc.com/2018/04/24/child-identity-theft-is-a-growing-and-expensive-problem.html

[16] Larson, S., Infant Social Security numbers are for sale on the dark web, CNN Business, January 22, 2018, https://money.cnn.com/2018/01/22/technology/infant-data-dark-web-identity-theft/index.html

[17] *Supra* at n. 15.

CLASS ACTION COMPLAINT

42.     There were 13,852 identity theft complaints to the Federal Trade Commission in 2017 affecting children and teens (age 19 and under), which represents 3.89% of all identity theft complaints for the year. Experian is alerted to 25,000 to 30,000 fraud cases reported each year and approximately 17% were targeted at children. Child identity fraud or theft will affect 25% of children before turning 18.[18]

### G. Sarrell's Conduct Violates HIPAA

43.     The Healthcare Insurance Portability and Accountability Act, 42 U.S.C. § 1320 *et seq.* ("HIPAA"), requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[19]

44.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq.* These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

45.     Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. Sarrell's security failures include, but are not limited to:

    a.  Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant creates, receives, maintains, and transmits in violation of 45 C.F.R. §164.306(a)(1);

    b.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to

---

[18] https://www.experian.com/blogs/ask-experian/identity-theft-statistics/

[19] https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/

allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

c. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

d. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

e. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

f. Failing to protect against any reasonably-anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g. Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

h. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

i. Failing to effectively train all members of its workforce on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out its functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

CLASS ACTION COMPLAINT

### H. Sarrell's Actions Fail to Comply with FTC Guidelines

46.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[20]

47.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses.[21] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

48.     The FTC further recommends that companies: not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[22]

49.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

---

[20] Federal Trade Commission, *Start With Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[21] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[22] FTC, *Start With Security*, *supra* note 19.

CLASS ACTION COMPLAINT

1  Orders resulting from these actions further clarify the measures businesses must take to meet their

2  data security obligations.

3        50.    Sarrell failed to properly implement basic data security practices. Sarrell's failure to

4  employ reasonable and appropriate measures to protect against unauthorized access to Patient PII

5  constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

6        51.    Sarrell was at all times fully aware of its obligation to protect the PII of Patients

7  because of its position as a trusted healthcare provider. Sarrell was also aware of the significant

8  repercussions that would result from its failure to do so.

9  ### I.  *Sarrell Fails to Comply with Industry Standards*

10        52.    Data exfiltrated from healthcare providers continues to be a high value target among

11  cybercriminals. In 2017, the U.S. healthcare sector experienced over 330 data breaches, a number

12  that continued to grow in 2018 (363 breaches).[23] The costs of healthcare data breaches are among the

13  highest across all industries, topping $380 per stolen record in 2017 as compared to the global

14  average of $141 per record. *Id.* As a result, both the government and private sector have developed

15  industry best standards to address this growing problem.

16        53.    The Department of Health and Human Services' Office for Civil Rights ("DHHS")

17  notes that "[w]hile all organizations need to implement policies, procedures, and technical solutions

18  to make it harder for hackers to gain access to their systems and data, this is especially important in

19  the healthcare industry. Hackers are actively targeting healthcare organizations as they store large

20  quantities of highly sensitive and valuable data."[24] DHHS highlights several basic cybersecurity

21  safeguards that can be implemented to improve cyber resilience which require a relatively small

22  financial investment, yet can have a major impact on an organization's cybersecurity posture

23  including: (a) the proper encryption of PII; (b) educating and training healthcare employees on how

24

25  [23] https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry; Identity Theft Resource Center, 2018 End of Year Data Brach Report, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-

26  End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf

27  [24] HIPAA Journal, Cybersecurity Best Practices for Healthcare Organizations, https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/

28

CLASS ACTION COMPLAINT

to identify social engineering attacks; (c) reviewing audit logs regularly in order to identify attempts by unauthorized individuals to gain access to PII/PHI before they result in a data breach; and (d) correcting the configuration of software and network devices.

54. Private cyber security firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because of the of value of the PII that it maintains and because, as an industry, it has been slow to adapt and respond to cybersecurity threats.[25] They too have promulgated similar best practices for bolstering cyber security and protecting against the unauthorized disclosure of PII.

55. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Sarrell chose to ignore them. Only _after_ the Data Breach did Sarrell institute and fortify some protections that should have already been in place to prevent incidents such as the Data Breach. These best practices were known, or should have been known by Sarrell, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of PII.

### J. Plaintiff and Class Members Suffered Damages

56. The ramifications of Defendant's failure to keep Patients' PII secure are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[26]

57. The PII belonging to Plaintiff and Class Members is private, sensitive in nature, and was left inadequately protected by Defendant who did not obtain Plaintiff's or Class Members' consent to disclose such PII to any other person as required by applicable law and industry standards.

---

[25] See e.g., https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry; https://resources.infosecinstitute.com/category/healthcare-information-security/is-best-practices-for-healthcare/10-best-practices-for-healthcare-security/#gref

[26] 2014 LexisNexis True Cost of Fraud Study, https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

CLASS ACTION COMPLAINT

58.     The Data Breach was a direct and proximate result of Sarrell's failure to: (a) properly safeguard and protect Plaintiff and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff and Class Members' PII; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

59.     Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately invest in data security measures, despite its obligation to protect Patient data.

60.     Had Defendant remedied the deficiencies in its data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusion into its systems and, ultimately, the theft of Patients' PII.

61.     As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take time they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[27]

62.     To date, Sarrell has merely offered access to complimentary credit monitoring services and an unspecified insurance reimbursement policy. The offer, however, is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and it entirely fails to provide any compensation for the unauthorized release and disclosure of Plaintiff and Class Members' PII.

---

[27] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013 available at https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited April 19, 2019).

CLASS ACTION COMPLAINT

63.     Furthermore, Defendant's credit monitoring offer to Plaintiff and Class Members squarely places the burden on Plaintiff and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts that resulted in the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit monitoring services upon discovery of the Breach, Defendant merely sent instructions "offering" the services to affected Patients recommending they sign up for the services. Also, despite exposing the PII of minors, Defendant offers them no credit monitoring or other accommodation at all.

64.     As a result of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, or are at increased risk of suffering:

       a.   The compromise, publication, theft and/or unauthorized use of their PII;

       b.   Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

       c.   Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

       d.   The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII in its possession; and

       e.   Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

65.     In addition to a remedy for the economic harm, Plaintiff and the Class maintain an undeniable interest in ensuring that their PII is secure, remains secure, and is not subject to further misappropriation and theft.

### K. Defendant's Delay in Identifying & Reporting the Data Breach Caused Additional Harm

66.     It is axiomatic that "[t]he quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."[28]

67.     Indeed, once a data breach has occurred, "[o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves" (internal citations omitted).[29]

68.     Although the Data Breach occurred in January 2019, and was discovered in July, Sarrell did not notify affected Patients until September 2019, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

69.     As a result of Sarrell's delay in detecting and notifying Patients of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

### CLASS ACTION ALLEGATIONS

70.     Plaintiff seeks relief on behalf of herself and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a Nationwide Class defined as follows:

> All persons whose PII was compromised as a result of the Data Breach announced by Sarrell on or about September 12, 2019 (the "Class").

---

[28] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire, https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million.

[29] Consumer Reports, The Data Breach Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too, January 31, 2019, https://www.consumerreports.org/data-theft/the-data-breach-next-door/

71.     Excluded from the Class are Sarrell and any of its affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

72.     Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

73.     The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

74.     **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the Members of the Class are so numerous and geographically dispersed that the joinder of all Members is impractical.  The Data Breach implicates 391,472 current and former Sarrell Patients. Sarrell has physical and email addresses for Class Members who, therefore, may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

75.     **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

    a.   Whether Sarrell had a duty to protect Patient PII;

    b.   Whether Sarrell knew or should have known of the susceptibility of its systems to a data breach;

    c.   Whether Sarrell's security measures to protect its systems were reasonable in light of best practices recommended by data security experts, the FTC and HIPAA;

    d.   Whether Sarrell was negligent in failing to implement reasonable and adequate security procedures and practices;

e.  Whether Sarrell's failure to implement adequate data security measures allowed the breach of its data systems to occur;

f.  Whether Sarrell's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the unlawful exposure of Plaintiff and Class Members' PII;

g.  Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Sarrell's failure to reasonably protect its systems and data network; and,

h.  Whether Plaintiff and Class Members are entitled to relief.

76.     **Typicality. Fed. R. Civ. P. 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of other Class Members.  Plaintiff was a Sarrell patient whose PII was exposed in the Data Breach. Plaintiff's damages and injuries are akin to other Class Members, and Plaintiff seeks relief consistent with the relief sought by the Class.

77.     **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a Member of the Class she seeks to represent; is committed to pursuing this matter against Sarrell to obtain relief for the Class; and has no conflicts of interest with the Class. Moreover, Plaintiff's Counsel are competent and experienced in litigating class actions, including privacy litigation of this kind. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

78.     **Superiority. Fed. R. Civ. P. 23(b)(3).**  Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Sarrell, and thus, individual litigation to redress Sarrell's wrongful conduct would be impracticable. Individual litigation by each Class

Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

79.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

80.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to:

      a.   Whether Sarrell failed to timely notify Patients of the Data Breach;

      b.   Whether Sarrell owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

      c.   Whether Sarrell's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

      d.   Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

      e.   Whether Defendant failed to take commercially reasonable steps to safeguard patient PII;

      f.   Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach; and

      g.   Whether Sarrell failed to comply with its obligations under HIPAA.

81.     Finally, all Members of the proposed Class are readily ascertainable. Sarrell has access to the names and addresses of those Patients affected by the Data Breach. Using this information, Class Members can be identified and ascertained for the purpose of providing notice.

## FIRST CAUSE OF ACTION
### NEGLIGENCE

82.     Plaintiff restates and realleges paragraphs 1 through 81 above as if fully set forth herein.

83.     As a condition of receiving services, Plaintiff and Class Members were obligated to provide Sarrell their PII directly or through their respective insurance carriers.

84.     Plaintiff and Class Members entrusted their PII to Sarrell with the understanding that Sarrell would safeguard their information.

85.     Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

86.     Defendant had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining and testing the Defendant's security protocols to ensure that PII in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on cyber security measures regarding the security of such information.

87.     Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, the current cyber scams being perpetrated and that it had inadequate employee training and education and IT security protocols in place to secure the PII of Plaintiff and the Class.

88.     Defendant's own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included

1   its decision not to comply with HIPAA and industry standards for the safekeeping and encrypted

2   authorized disclosure of the PII of Plaintiff and Class Members.

3       89.   Plaintiff and Class Members had no ability to protect their PII that was in Sarrell's

4   possession.

5       90.   Defendant was in a position to protect against the harm suffered by Plaintiff and Class

6   Members as a result of the Data Breach.

7       91.   Defendant had a duty to put proper procedures in place in order to prevent the

8   unauthorized dissemination Plaintiff and Class Members' PII.

9       92.   Defendant has admitted that Plaintiff and Class Members' PII was wrongfully

10   disclosed to unauthorized third persons as a result of the Data Breach.

11       93.   Defendant, through its actions and/or omissions, unlawfully breached its duty to

12   Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding

13   Plaintiff and Class Members' PII while it was within the Sarrell's possession or control.

14       94.   Defendant improperly and inadequately safeguarded Plaintiff and Class Members' PII

15   in deviation of standard industry rules, regulations and practices at the time of the Data Breach.

16       95.   Defendant, through its actions and/or omissions, unlawfully breached its duty to

17   Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent

18   dissemination of its Patients' PII.

19       96.   Defendant, through its actions and/or omissions, unlawfully breached its duty to

20   adequately disclose to Plaintiff and Class Members the existence, and scope of the Data Breach.

21       97.   But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and

22   Class Members, Plaintiff and Class Members' PII would not have been compromised.

23       98.   There is a temporal and close causal connection between Defendant's failure to

24   implement security measures to protect the PII and the harm suffered, or risk of imminent harm

25   suffered by Plaintiff and the Class.

26       99.   As a result of  Defendant's negligence, Plaintiff and Class Members have suffered

27   and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses

28

associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

## SECOND CAUSE OF ACTION
## NEGLIGENCE *PER SE*

100.    Plaintiff restates and realleges Paragraphs 1 through 81 above as if fully set forth herein.

101.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Sarrell, of failing to use reasonable measures to protect PII.  The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

102.    Sarrell violated Section 5 of the FTC Act by failing to use reasonable measures to protect patient PII and not complying with applicable industry standards, as described in detail herein.  Sarrell's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

103.    Sarrell's violation of Section 5 of the FTC Act constitutes negligence *per se*.

104.    Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

105.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.  The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

106.    Sarrell's violation of HIPAA also independently constitutes negligence per se.

107.    HIPAA privacy laws were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such information can be used, and who it can be disclosed to. HIPAA privacy laws not only apply to healthcare providers and

1    the organizations they work for but to any entity that may have access to healthcare information

2    about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the

3    patient's finances or reputation.

4        108.    Plaintiff and Class Members are within the class of persons that HIPAA privacy laws

5    were intended to protect.

6        109.    The harm that occurred as a result of the Data Breach is the type of harm HIPAA

7    privacy laws were intended to guard against.

8        110.    As a direct and proximate result of Sarrell's negligence per se, Plaintiff and the Class

9    have suffered, and continue to suffer, injuries and damages arising from the Data Breach including,

10   but not limited to: damages from lost time and effort to mitigate the actual and potential impact of

11   the Data Breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit

12   reporting agencies, contacting their financial institutions, closing or modifying financial and medical

13   accounts, closely reviewing and monitoring their credit reports and various accounts for

14   unauthorized activity, and filing police reports, and damages from identity theft, which may take

15   months if not years to discover and detect.

16       111.    Additionally, as a direct and proximate result of Sarrell's negligence *per se*, Plaintiff

17   and Class Members have suffered and will suffer the continued risks of exposure of their PII, which

18   remains in Sarrell's possession and is subject to further unauthorized disclosures so long as Sarrell

19   fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

20                          **THIRD CAUSE OF ACTION**
                            **BREACH OF IMPLIED CONTRACT**
21

22       112.    Plaintiff restates and realleges paragraphs 1 through 81 above as if fully set forth

23   herein.

24       113.    Plaintiff and Class Members were required to provide their PII, including their names,

25   mailing addresses, dates of birth, Social Security numbers, driver's license numbers and various

26   health-related information to Defendant as a condition of their use of Defendant's services.

27

28

114.    Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services, along with Defendant's promise to protect their health information and other PII from unauthorized disclosure.

115.    In their written privacy policies, Sarrell expressly promised Plaintiff and Class Members that they would only disclose protected health information and other PII under certain circumstances, none of which relate to the Data Breach.

116.    Sarrell promised to comply with HIPAA standards and to make sure that Plaintiff and Class Members' health information and other PII would remain protected.

117.    Implicit in the agreement between Plaintiff and Class Members and Defendant to provide protected health information and other PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) to prevent unauthorized disclosures of the PII, (d)  to provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) to reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) to retain the PII only under conditions that kept such information secure and confidential.

118.    Without such terms of implied contract, Plaintiff and Class Members would not have provided their PII to Defendant.

119.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant, however, Defendant did not.

120.    Defendant breached the implied contracts with Plaintiff and Class Members by failing to:

> a. reasonably safeguard and protect Plaintiff and Class Members' PII, which was compromised as a result of the Data Breach;
>
> b. comply with its promise to abide by HIPAA;
>
> c. ensure the confidentiality and integrity of electronic protected health information Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

d.  implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

e.  implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

f.  identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii); and

g.  protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2).

## FOURTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY

121.  Plaintiff restates and realleges paragraphs 1 through 81 above as if fully set forth herein.

122.  In light of their special relationship, Defendant has become the guardian of Plaintiff and Class Members' PII. Defendant has become a fiduciary, created by its undertaking and guardianship of patient PII, to act primarily for the benefit of its Patients, including Plaintiff and Class Members. This duty included the obligation to safeguard Plaintiff and Class Members' PII and to timely notify them in the event of a data breach.

123.  Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship. Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to:

a.  properly encrypt and otherwise protect the integrity of the system containing Plaintiff and Class Members' protected health information and other PII;

b.  timely notify and/or warn Plaintiff and Class Members of the Data Breach;

c.  ensure the confidentiality and integrity of electronic protected health information Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d.  implement technical policies and procedures to limit access to only those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

e.  implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1);

f.  identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

g.  protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2);

h.  protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

i.  ensure compliance with the HIPAA security standard rules by their workforce in violation of 45 C.F.R. § 164.306(a)(94);

j.  protect against the improper use and disclosure of protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, *et seq.*;

k.  effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health

CLASS ACTION COMPLAINT

1   information in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. §
2   164.308(a)(5);

3   l.  design, implement, and enforce policies and procedures establishing physical
4   and administrative safeguards to reasonably safeguard protected health
5   information, in compliance with 45 C.F.R. § 164.530(c); and

6   m. otherwise failing to safeguard Plaintiff and Class Members' PII.

7   124.    As a direct and proximate result of Defendant's breaches of its fiduciary duties,
8   Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i)
9   actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket
10  expenses associated with the prevention, detection, and recovery from identity theft and/or
11  unauthorized use of their PII; (iv) lost opportunity costs associated with the effort expended and the
12  loss of productivity addressing and attempting to mitigate the actual and future consequences of the
13  Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest,
14  and recover from identity theft; (v) the continued risk to their PII, which remains in Defendant's
15  possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake
16  appropriate and adequate measures to protect Patient PII in its continued possession; and (vi) future
17  costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair
18  the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of
19  Plaintiff and Class Members.

20  **WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, respectfully
21  requests the following relief:

22  a.  An Order certifying this case as a class action;

23  b.  An Order appointing Plaintiff as the class representative;

24  c.  An Order appointing Jean S. Martin and Jonathan B. Cohen as class counsel;

25  d.  A mandatory injunction directing Defendant to hereinafter adequately
26  safeguard the PII of the Class by implementing improved security procedures
27  and measures;

28

e.  An award of damages;

f.  An award of costs and expenses;

g.  An award of attorneys' fees; and

h.  Such other and further relief as this court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: October 23, 2019                           Respectfully submitted,

**MORGAN & MORGAN, P.A.**

Ike Gulas (AL Bar No.  ASB 0576 S82T
2031 2nd Ave. N.
Birmingham, AL 35203
Phone: (205) 517-6858
Facsimile: (205) 517-6878
igulas@forthepeople.com

**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
Jean S. Martin (*Pro Hac Vice* Forthcoming)
Jonathan B. Cohen (*Pro Hac Vice* Forthcoming)
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-2434
jeanmartin@forthepeople.com
jcohen@forthepeople.com

***Attorneys for Plaintiff and the Putative Class***

31